THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JUDITH BURBRINK,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>PHYLLIS J. CAMPBELL, et al.,<br><br>　　　　　　　Defendant. | CASE NO. C15-0377-JCC<br><br>ORDER GRANTING RULE 23.1<br>MOTION TO DISMISS |

This matter comes before the Court on Nominal Defendant Nordstrom's Rule 23.1 Motion to Dismiss (Dkt. No. 76), Nordstrom's Request for Judicial Notice (Dkt. No. 77) and Plaintiff's Opposition (Dkt. No. 81). The Court heard oral argument on September 22, 2015. Having thoroughly considered the parties' briefing, the relevant record, and oral argument presented to the Court, the motion is hereby GRANTED for the reasons explained herein.

I.　　BACKGROUND

Plaintiff Judith Burbrink, a Nordstrom shareholder, brings the above-captioned matter derivatively on behalf of Nominal Defendant, the Nordstrom Corporation ("Nordstrom" or "the Company") and its shareholders. (Dkt. No. 11 at 4.) At the heart of Plaintiff's suit are allegations of abuse regarding the Company's flight department; including that, in approving the use of the flight department and misrepresenting its fiscal impact to shareholders, the Board of Directors breached their fiduciary duties and committed corporate waste. (*Id.* at 36–42.) Plaintiff further

alleges that certain related parties, owned by members of the Nordstrom family, aided and abetted in the directors' breach of fiduciary duties and unjustly enriched themselves. (*Id.*)

**A.      Preliminary Discussion of Nordstrom's Request for Judicial Notice**

In conjunction with its Rule 23.1 motion to dismiss, Nominal Defendant Nordstrom filed several exhibits and asks the Court either consider them "incorporated by reference" into the Complaint, or to take judicial notice of them. (Dkt. No. 77.) Nordstrom requests the Court to consider the following:

| Document | Where Referenced in Complaint |
|---|---|
| Excerpts from Nordstrom's March 31, 1998 proxy statement | Dkt. No. 11 at 14 |
| Excerpts from Nordstrom's March 31, 1999 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 10, 2000 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 11, 2001 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 18, 2002 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 17, 2003 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 15, 2004 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 18, 2005 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 13, 2006 proxy statement | Dkt. No. 11 at 14 (¶ 57 refers to the "amount of services" provided by the Company to Related-Party JBW from years 1999–2007) |
| Excerpts from Nordstrom's April 12, 2007 proxy statement | Dkt. No. 11 at 13, 25, 29, 34. |
| Excerpts from Nordstrom's April 10, 2008 proxy statement | Dkt. No. 11 at 15, 22 – 23, 25, 29, 34. |

| Excerpts from Nordstrom's April 9, 2009 proxy statement | Dkt. No. 11 at 13, 24, 25, 29, 34. |
|---|---|
| Excerpts from Nordstrom's April 8, 2010 proxy statement | Dkt. No. 11 at 13, 25, 29, 34. |
| Excerpts from Nordstrom's March 31, 2011 proxy statement | Dkt. No. 11 at 13, 25, 29, 34. |
| Excerpts from Nordstrom's March 30, 2012 proxy statement | Dkt. No. 11 at 13, 25, 29, 34. |
| Excerpts from Nordstrom's March 26, 2013 proxy statement | Dkt. No. 11 at 29 (¶ 108 references "every proxy statement since 2007). |
| Excerpts from Nordstrom's March 27, 2014 proxy statement | Dkt. No. 11 at 13, 14, 19, 29, 33. |
| Nordstrom's Corporate Governance and Nominating Committee Charter | Dkt. No. 11 at 12. |
| Nordstrom's Passenger Usage Report | Dkt. No. 11 at 25, 28, 29, 30, 31, 32. |
| Survey of rates provided by ARGUS International, Inc. | Dkt. No. 11 at 23. |
| Letter from M. Todd Scott to Hung Ta December 30, 2014 | Dkt. No. 11 at 21–22. |
| Letter from M. Todd Scott to Hung Ta February 10, 2015 | Dkt. No. 11 at 21–22. |
| Excerpts from Nordstrom's March 26, 2015 proxy statement | N/A (Nordstrom requests that judicial notice be taken). |
| Nordstrom's Form 10-K dated March 16, 2015. | N/A (Nordstrom requests that judicial notice be taken). |
| Nordstrom's Articles of Incorporation | N/A (Nordstrom requests that judicial notice be taken). |
| National Business Aviation Association, *NBAA Management Guide* | N/A (Nordstrom requests that judicial notice be taken). |
| John J. Sheehan, *Business and Corporate Aviation Management* | N/A (Nordstrom requests that judicial notice be taken). |
| Stephen A. Radin, *The Business Judgment Rule* | N/A (Nordstrom requests that judicial notice be taken). |

When ruling on a motion to dismiss, a district court may not typically consider evidence outside the pleadings without converting the motion into a Rule 56 motion for summary judgment. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). However, documents that are "incorporated by reference" in the complaint or facts for which judicial notice are taken may be considered without conversion into a Rule 56 motion. *Id.* (citing *Van Buskirk v. CNN*, 284 F.2d 977, 908 (9th Cir. 2002)).

The doctrine of "incorporation by reference" has been articulated in various ways. Courts

ORDER GRANTING RULE 23.1 MOTION TO
DISMISS
PAGE - 3

typically require that a document be "referred to extensively" in the complaint or "form the basis" of the complaint to be considered incorporated by reference. *Ritchie*, 342 F.3d at 908. An insurance coverage plan "forms the basis" of a complaint based on coverage and a newspaper article containing an allegedly defamatory statement "forms the basis" of the corresponding defamation complaint. *Parrino v. FHIP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998) (insurance); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)) (newspaper). Another route to incorporation exists "if the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance . . ." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (where a billing agreement was not explicitly referred to in the complaint but necessary to the claim and its authenticity was not disputed, it was validly considered on a motion to dismiss).

A court may also review materials on a motion to dismiss if they are the subject of judicial notice. Judicial notice may be taken of factual matters that are either generally known or "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *Ritchie*, 342 F.3d at 908–09; Fed. R. Evid. 201(b). Judicial notice should be taken with reserve, however, as its function is to deprive a party of the opportunity to attack opposing evidence through rebuttal and cross-examination. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005).

The Court considers all of the proxy statements but the 2015 statement, as well as the passenger usage report, the Corporate Charter, and the ARGUS rate survey listed above, to be "incorporated by reference," because their contents are alleged in the Complaint, their authenticity is not in question,[1] and there is no dispute as to their relevance.

---

[1] As demonstrated by Plaintiff's reliance on the very same documents. (Dkt. No. 81 at 15, 24, 25, 31.)

ORDER GRANTING RULE 23.1 MOTION TO
DISMISS
PAGE - 4

The Court declines to take judicial notice of the remaining documents: the letters between counsel, the 2015 proxy statement excerpt, the 10-K form, Nordstrom's Articles of Incorporation, the NBAA Management Guide, and the two articles (Sheehan and Radin). Nor does the Court consider these documents "incorporated by reference." While at a later stage of litigation, it may very well prove appropriate to weigh the validity and credibility of their contents, the Court does not find consideration of these documents necessary at the motion to dismiss stage. The Court's primary inquiry here is not whether Plaintiff's allegations are true, but whether her Complaint meets the pleading standards to overcome Defendants' various challenges.

B.  **The Flight Department**

For "nearly twenty years," Nordstrom, a fashion retailer, has operated its own flight department. (Dkt. No. 11 at 4; Dkt. No. 76 at 9.) According to Nordstrom, the flight department serves as "an integral part of its business," in enabling employees "to travel efficiently, often on short notice, throughout North America, and on other trips for business purposes." (Dkt. No. 76 at 9.) What started as the leasing of a single aircraft from JBW Aircraft Leasing Company, Inc. ("JBW") in 1998 grew steadily over the years, until in 2007 when the flight department expanded considerably. (Dkt. No. 11 at 14–15.) The Company's 2008 proxy statement revealed that in 2007 its flight department dramatically increased in size, assuming responsibility for the "housing, flying, servicing, and repairing of aircraft owned by members of the Nordstrom family." (*Id.* at 4, 14–15.) The flight department's 2007 expansion came about by virtue of the approval of what are referred to throughout this Order as the "related-party transactions," wherein Nordstrom began to offer aviation-related services to related parties owned by members of the Nordstrom family.

Nordstrom itself owns two aircraft, a 22-seat 2006 Bombardier and an 8-seat 2005 Bombardier. (Dkt. No. 11 at 15.) Additionally, the company "dry leases" two planes—meaning,

uses them when they are not in use by their owners—from JBW.[2] (*Id.* at 16.) It is Company policy only to use Company Aircraft or dry-lease planes for business travel. (Dkt. No. 76 at 14.)

In addition to the aircraft it owns and leases, Nordstrom employs several pilots—as of August 2014 nine of them are full-time[3]—as a part of its flight department in addition to ground crew and maintenance staff. (Dkt. No. 11 at 16.) When the resources and employees of the Nordstrom flight department are not in use for Company travel, the department provides paid services to "related-party planes," including management, maintenance, and pilot services. (Dkt. No. 11 at 16; Dkt. No. 76 at 14.) The "related-party planes," owned by related parties named as defendants in this suit, are as follows:

1) The two "dry-leased" planes from JBW mentioned above, a 22-seat 2006 Bombardier and an 11-seat 2007 Cessna. When not used under the Company's dry lease, the Nordstrom family flies on these planes; flight records indicate that family members flew 501, 418, and 377 hours on these two planes in Fiscal Years 2011, 2012, and 2013, respectively;

2) An 11-seat 2008 Pilatus registered to Related Party Defendant JD Plane, which is owned by James F. Nordstrom, Jr. and Daniel Nordstrom;

3) An 11-seat floatplane[4] registered to Related Party Defendant TB Plane, which is owned by Sally A. Nordstrom;

4) Two 8-seat floatplanes registered to Related Party Defendant JWL, Ltd., which is owned by John N. Nordstrom;

5) A 12-seat 2001 Pilatus registered to Related Party Defendant 247N, LLC, which is owned by Blake Nordstrom and Chris Hughes; and

6) An 8-seat floatplane registered to Related Party Defendant M&B Beaver, which is owned by Blake Nordstrom and his wife.

---

[2] JBW is owned by members of the Nordstrom family. As of February 2013, it was owned by John N. Nordstrom, Bruce A. Nordstrom, and D. Wayne Gittinger (a former Nordstrom director and Bruce Nordstrom's brother-in-law, now deceased). (Dkt. No. 11 at 9.)

[3] Plaintiff's complaint alleges that Nordstrom employs twelve pilots (Dkt. No. 11 at 16), though Nordstrom's motion indicates that it has had as few as eight and as many as ten pilots employed full-time (Dkt. No. 76 at 14).

[4] A floatplane is a type of seaplane, supported on the water by one or more floats. "floatplane," MERRIAM-WEBSTER ONLINE DICTIONARY. 2015. http://www.merriam-webster.com/dictionary/floatplane (last visited August 11, 2015).

ORDER GRANTING RULE 23.1 MOTION TO DISMISS
PAGE - 6

(Dkt. No. 11 at 16–17.) Nordstrom charges these "related parties" for the services, hangar space, and employee time used. (Dkt. No. 76 at 15.) The rates to charge the related parties for aviation services were set after consultation with an independent industry expert, ARGUS International ("ARGUS"). (Dkt. No. 76 at 15; Dkt. No. 75 at 10; Dkt. No. 78 at 14.) Plaintiff alleges, however, that Nordstrom undercharges these related parties—owned by Nordstrom family members—for its flight department services. (Dkt. No. 11 at 18–19.) For example, on a fourteen day trip to Hawaii in 2013, the Company allegedly charged John Nordstrom three days' worth of pilot fees. (*Id.* at 18.) Similarly, on December 28, 2013, two sets of two-pilot crews flew the dry-leased JBW planes from King County, Washington to Puerto Vallarta, Mexico and stayed until January 4, 2014. Plaintiff alleges that the Company only charged Bruce Nordstrom for two days' worth of pilot fees. (*Id.* at 19.)

Plaintiff alleges that the flight department now costs Nordstrom shareholders millions of dollars. (Dkt. No. 11 at 4.) Plaintiff also alleges that the Company take-over of responsibility for aircraft owned by the Nordstrom family coincides with the global financial crisis between 2007 and 2008 during which time the price of Nordstrom stock dropped from approximately $55 per share to $6.61 per share. (Dkt. No. 11 at 14–15.) Plaintiff suggests that the transactions by which the company assumed responsibility for family aircraft amounted to a "secret bail-out of the [Nordstrom] family." (Dkt. No. 81 at 9.)

**C.   The Parties**

As demonstrated by the filing of three separate motions to dismiss, the Complaint identifies numerous defendants. The Court adopts the following umbrella terms for the four categories of defendants in this case: (1) the "Director Defendants," referring to all of the current and former members of the Nordstrom Board of Directors named in the Complaint, (2) the "Family Member Defendants" (a sub-section of the Director Defendants), (3) the "Governance Committee Defendants" (a sub-section of the Director Defendants), and (4) the "Related-Party

Defendants."[5]

### 1.     Director Defendants

The following persons are members of the Nordstrom Board of Directors and are identified as defendants in the Complaint:

1) Phyllis J. Campbell, a director since 2004;

2) Michelle M. Ebanks, a director since 2011;

3) Enrique Hernandez, Jr., a director since 1997, a member of the Corporate Governance Committee since 2004, and chair of the Governance Committee between 2007 and 2009;

4) Jeanne P. Jackson, a former director from 2002 to 2009;

5) Robert G. Miller, a director since 2005;

6) Philip G. Satre, a director since 2006, a Governance Committee member since approximately 2007, and the Governance Committee Chair since approximately 2010;

7) Brad Smith, a director since 2013;

8) Felicia D. Thornton, a director from 2010 to 2012;

9) B. Kevin Turner, a director since 2010;

10) Robert D. Walter, a director since 2008 and a Governance Committee member since 2011;

11) Alison A. Winter, a director since 2001 and a Governance Committee member since approximately 2006;

12) Blake W. Nordstrom, a director since 2005, the President of the Nordstrom Company, the son of Bruce Nordstrom and the brother of Erik and Peter Nordstrom;

---

[5] The Defendants split themselves up by different designations: Defendants Phyllis J. Campbell, Michelle M. Ebanks, Enrique Hernandez, Jr., Jeanne P. Jackson, Robert G. Miller, Philip G. Satre, Brad Smith, Felicia D. Thornton, Kevin Turner, Robert D. Walter, and Alison A. Winter refer to themselves as the "Outside Directors." (Dkt. No. 78 at 9.)

13) Erik B. Nordstrom, a director since 2006, an Executive Vice President and President of "Nordstrom Direct," the son of Bruce Nordstrom and the brother of Blake and Peter Nordstrom; and

14) Peter E. Nordstrom, a director since 2006, an Executive Vice President and President of Merchandising, the son of Bruce Nordstrom and the brother of Blake and Erik Nordstrom.

(Dkt. No. 11 at 7–8.)

**2.   Family Member Defendants**

Nordstrom was founded as a shoe retailer in 1901 by John W. Nordstrom and Carl Wallin. "Nordstrom Company History," http://shop.nordstrom.com/c/company-history (last visited August 11, 2015). While Nordstrom has been a public company since 1971, it continues to be controlled and operated significantly by members of the Nordstrom family. (*See* Dkt. No. 11 at 13–14.) Members of the Nordstrom family own at least 27% of the Company.[6]

Of the directors named as defendants, Blake Nordstrom, Erik Nordstrom, and Peter Nordstrom are members of the Nordstrom family and referred to collectively as the "Family Member Defendants."

**3.   Governance Committee Defendants**

Of the directors named as defendants, Enrique Hernandez, Jr., Philip G. Satre, Robert D. Walter, and Alison A. Winter all served on the Board's Governance Committee, which approved the "related-party transactions" by which the Company flight department began to offer services to the Related-Party Defendants listed below, and are collectively referred to as the "Governance Committee Defendants." (Dkt. No. 11 at 9.)

**4.   Related Party Defendants**

The "Related-Party Defendants" are entities with which Nordstrom's flight department transacts. Named in the Complaint, they are as follows:

---

[6] According to the most recent proxy statement, Bruce A. Nordstrom, the grandson of founder John W. Nordstrom, owns 13.84% of the company; his sister Anne E. Gittinger owns 8.16%' and his sons, Defendants Blake, Erik, and Peter Nordstrom collectively own 4.82%. (Dkt. No. 11 at 14.)

1) Hangar Three, LLC, owned by Blake Nordstrom, James F. Nordstrom, Jr. and John N. Nordstrom, which entered into a sublease with the Company for land at the King County International Airport;

2) JBW Aircraft Leasing Company, Inc. ("JBW"), owned by John N. Nordstrom, Bruce Nordstrom, and Bruce Nordstrom's brother-in-law D. Wayne Gittinger (deceased), which has two planes that receive aviation-related services from Nordstrom;

3) JD Plane, LLC ("JD Plane"), co-owned by James F. Nordstrom, Jr. and Daniel Nordstrom, which has a plane that receives aviation-related services from Nordstrom;

4) JW, Ltd., owned by John N. Nordstrom, which has two planes that receive aviation-related services from Nordstrom;

5) M&B Beaver, LLC, owned by Blake Nordstrom and his wife Molly Nordstrom, which has a plane that receives aviation-related services from Nordstrom;

6) SDJ, LLC, owned by James F. Nordstrom, Jr., which has a plane that receives aviation-related services from Nordstrom;

7) TB Plane, LLC, owned by Sally A. Nordstrom, which has a plane that receives aviation-related services from Nordstrom;

8) 247N, LLC, co-owned by Chris Hughes and Blake Nordstrom, which has a plane that receives aviation-related services from Nordstrom;

9) Blake Nordstrom is also sued in his capacity as a related party who received related-party services from Nordstrom.

(Dkt. No. 11 at 9–10.)

**D. The Board's Treatment of Nordstrom's Flight Department**

Plaintiff argues that, in approving the related-party transactions with the above-named related-party defendants (entities owned by members of the Nordstrom family), and misrepresenting the fiscal impact of the transactions, the Director Defendants breached their fiduciary duties to Company's shareholders and committed corporate waste. (Dkt. No. 11 at 36–42.)

For one, Plaintiff alleges that the Director Defendants failed to properly review the costs

to the Company of the related-party transactions. (Dkt. No. 11 at 22–23.) Citing meeting minutes from the Board of Directors' Governance Committee, Plaintiff argues that any discussion or review of the costs of related-party transactions between Nordstrom's flight department and the Related-Party Defendants was merely "perfunctory." (*Id.*) Plaintiff further alleges that members of the Governance Committee personally benefitted from the related-party transactions by flying on the planes serviced by the Nordstrom flight department. (*Id.* at 25.)

Furthermore, Plaintiff alleges that the Director Defendants falsely represented to shareholders in proxy statements that "payments [received from the Nordstrom family] exceeded the estimated cost to the Company of providing those [aviation-related] services." (*Id.* at 24.) In 2009, the Director Defendants issued a proxy statement that stated, "in the Board's opinion, the charges [to the Nordstrom family] were fair and beneficial to the Company because the payments allowed the Company to subsidize the cost of operating the Company's flight department." (*Id.* at 24.)

Finally, Plaintiff alleges that the Related-Party Defendants aided and abetted in the Director Defendants' breach of fiduciary duties and unjustly enriched themselves. (Dkt. No. 11 at 40–42.)

## II. DISCUSSION

### A. Demand Futility and Plaintiff's Derivative Shareholder Standing

The premise of Nominal Defendant Nordstrom's Rule 23.1 Motion to Dismiss is that Plaintiff failed to make the requisite demand on the Nordstrom Board of Directors prior to filing this lawsuit, and that accordingly she lacks derivative standing to sue on behalf of the corporation. (Dkt. No. 76 at 9.) Plaintiff concedes that no such demand was made, but argues that she is excused from this requirement as such a demand would have been futile. (Dkt. No. 11 at 26–27.) Pre-suit demand requirements and the futility exceptions thereto are governed by the law of the state of incorporation. *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 108–109 (1991). Nordstrom is a Washington corporation with its headquarters in Seattle. (Dkt. No. 11 at

7.) Washington courts typically look to Delaware for guidance regarding shareholder derivative litigation. *See In re F5 Networkers, Inc.*, 207 P.3d 433, 439 (Wash. 2009) (adopting reasoning from *In re Cray, Inc.*, 431 F.Supp.2d 1114, 1121 (W.D. Wash. 2006)).

Federal Rule of Civil Procedure 23.1 provides, in relevant part:

> "[W]hen one or more shareholders or members of a corporation . . . bring a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce . . . [t]he complaint shall . . . state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort . . ."

Fed. R. Civ. P. 23.1(a)–(b).

Unlike a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of a plaintiff's substantive claim, but rather "to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (citing *Levine v. Smith*, 1989 WL 150784, *5 (Del.Ch.1989), *aff'd* 591 A.2d 194 (Del.1991)).

In a shareholder derivative suit context, the claims asserted by the plaintiff belong not to her, but to the corporation. *See* Fed. R. Civ. P. 23.1(a). For this reason, Rule 23.1 imposes a "demand requirement," of shareholders prior to bringing suit on the corporations behalf: "[a] shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile." *Khanna v. McMinn*, 2006 WL 1388744, *11 (Del. Ch. May 9, 2006). This requirement stems from the well-settled principle that directors, rather than shareholders, manage the affairs of the corporation, and that the decision to bring or not to bring a lawsuit is a decision concerning the management of the corporation. *Spiegel v. Buntrock*, 571 A.2d 767, 772–3 (Del.1990)).

ORDER GRANTING RULE 23.1 MOTION TO DISMISS
PAGE - 12

The pre-suit demand requirement, however, is excused if the plaintiff can demonstrate "demand futility," by showing that there exists "a reasonable doubt, as of the time the complaint is filed, [that] the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *In re F5 Networks, Inc.*, 207 P.3d 433, 437 (Wash. 2009). The Delaware test, which Washington courts apply, established in *Aronson v. Lewis* provides a two-prong framework for demonstrating that demand is futile and therefore excused. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).[7] A "stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule," is excused from the demand requirement for derivative standing under Rule 23.1. *Brehm v. Eisner*, 746 A.2d 244, 254–55 (Del. 2000). If either prong is satisfied, demand is excused. *Id.* at 256.

For the purposes of the *Aronson* inquiry, "reasonable doubt" is "akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction is not protected by the business judgment rule." *Grimes v. Donald*, 673 A.2d 1207, 1217 n. 17 (Del. 1996) *overruled by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[8] "[The] concept [of reasonable doubt] is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Id.* at 1207.

"Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim." *Brehm*, 746 A.2d at 254.

---

[7] *Aronson* was overruled by the Delaware Supreme Court in 2000 by *Brehm v. Eisner*, but only to the extent that dicta in the *Aronson* case encouraged appellate courts to review decisions under Rule 23.1 under a deferential standard. 746 A.2d 244, 253–54. Its demand futility test remains good law.

[8] The *Brehm* decision overruled the portion of *Aronson* and its progeny, including *Grimes*, that indicates a deferential standard of review of orders on motions to dismiss under Rule 23.1. *See, supra,* note 6.

ORDER GRANTING RULE 23.1 MOTION TO DISMISS
PAGE - 13

As the Court finds that (1) the Nordstrom Board of Directors' ability to exercise independent, disinterested judgment was not compromised, and (2) the Complaint does not generate a reasonable doubt regarding whether the related-party transactions represent the exercise of sound business judgment, Nominal Defendant Nordstrom's motion to dismiss Plaintiff's case for failure to make a demand (Dkt. No. 76) is GRANTED.

**B.     The Board of Directors Contained a Disinterested, Impartial Majority at the Time Plaintiff Filed Suit**

The first prong of the *Aronson* demand futility test is met if Plaintiff can show that there is not a disinterested, impartial majority of the board of directors to consider her demand. *Aronson*, 473 A.2d at 812. The Court assesses the board composition as of the day Plaintiff filed her Complaint, March 12, 2015. *Id.* at 810; Dkt. No. 1. Directors are generally considered "interested" if (1) they have a "material financial or familial interest" in the transaction at issue, (2) they are "incapable of acting independently for some other reason such as dominion or control," or (3) they participated in the alleged misconduct such that they "face a substantial likelihood of liability." *In re Affiliated Computer Servs., Inc. Shareholders Litig.*, 2009 WL 296078, at *8 (Del. Ch. Feb. 6, 2009) (citing *Aronson*, 473 A.2d at 815).

**1.     The Family Member Defendants are Not Disinterested or Impartial**

As of March 12, 2015, the Nordstrom Board of Directors consisted of thirteen people—twelve of whom are named as defendants to this suit: (1) Campell, (2) Ebanks, (3) Hernandez, (4) Miller, (5) B. Nordstrom, (6) E. Nordstrom, (7) P. Nordstrom, (8) Satre, (9) Smith, (10) Turner, (11) Walter, (12) Winter, and (13) Shellye L. Archambeau, who is not named as a defendant and who joined the board in February 2015.[9] (Dkt. No. 11 at 27.) Of these thirteen, three are Family Member Defendants Blake, Erik, and Peter Nordstrom. Neither party disputes that the Nordstrom brothers are "interested" for the purposes of the *Aronson* test. (*See* Dkt. No.

---

[9] The Complaint also names as Director Defendants Jackson and Thornton, neither of whom were still on the board when the Complaint was filed.

ORDER GRANTING RULE 23.1 MOTION TO
DISMISS
PAGE - 14

76 at 1, 5.) Courts often consider close family relationships a relevant factor capable of rendering directors unable to impartially consider a demand. *See In re Tyson Foods, Inc.*, 919 A. 2d 563, 584 (Del. Ch. 2007) (members of the Tyson family lacked independence due to "consanguinity or marriage"); *Mizel v. Connelly*, 1999 WL 550369, at *4 (Del Ch. 1999) (grandson unable to independently consider a demand that would be adverse to his grandfather); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 Del. Ch. LEXIS 144, at *28-29, 2002 WL 31888343 (Del. Ch.2002) (considering a director's son's primary employment with the corporation as one of several factors supporting a reasonable doubt whether the director could consider demand impartially); *Gerber v. EPE Holdings, LLC*, 2013 WL 209658 at *4, n. 48 (Del Ch. Jan. 18, 2013) (citing the New York Stock Exchange Listed Company Manual § 303A.02 which provides, *inter alia*, that a director is not independent if she or an immediate family member has been an employee or executive officer of the company in the last three years).

Considering the strong family ties between the Family Member Defendants and the Nordstrom Company—as well as to the entities with which the Company contracted in the related party transactions at issue—the Court concludes that these three defendants are not impartial or disinterested under the first prong of the *Aronson* test.

**2.      Governing Committee Defendants**

Plaintiff asserts that the four Governance Committee Defendants—Hernandez, Satre, Walter, and Winter—face a "substantial likelihood of liability" such that they could not impartially consider her demand. (Dkt. No. 81 at 23.) The Court disagrees.

**a.      Approval of Related-Party Transactions**

Plaintiff asserts claims against the Governance Committee Defendants for breach of fiduciary duty based particularly on their having approved the related-party transactions at issue in this suit. (Dkt. No. 11 at 37–38.) Plaintiff alleges that the committee failed to undergo a meaningful assessment of the costs to the Company of these transactions and cites to meeting minutes in support of her allegation. However, the Governance Committee was provided a report

discussing the rates local aviation providers charge. (Dkt. No. 11 at 23; Dkt. No. 77-3 at 11.) ARGUS prepared this report with information specific to the types of planes at issue as well as the geographical region in which they were located. (Dkt. No. 77-3 at 11–13.) ARGUS is an independent company that specializes in risk management in the context of aviation departments. (*Id.* at 11; http://aviationresearch.com/AboutARGUS (last visited Sept. 21, 2015).) With respect to the approval of the related-party transactions, the Governance Committee Defendants justifiably relied on the ARGUS report.

Rev. Code Wash. § 23B.08.300(2)(b) shields a director from liability where she "rel[ied] on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by . . . persons as to matters the director reasonably believes are within the person's professional or expert competence." The report compiled by ARGUS constitutes the very type of information upon which directors could reasonably rely. Accordingly, the Governance Committee Members do not face a substantial likelihood of liability for their role in approving the related-party transactions.

b.      **Remaining Claims**

The rest of Plaintiff's claims against the Governance Committee Defendants are common to all director defendants: namely, (1) a breach of fiduciary duty claim for the issuance of certain proxy statements and (2) corporate waste. (Dkt. No. 11 at 38–40.) The Court finds that the Complaint fails to establish a substantial likelihood of liability with regard to either claim. In so finding, the Court begins with the presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company," and includes strong presumptions of disinterestedness and independence. *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006) (citing *Aronson*, 473 A.2d at 812).

Furthermore, the Nordstrom Corporate Charter shields directors from liability for money damages. An exculpatory provision in the charter provides, in relevant part:

"Any personal liability of a director to the corporation or its shareholders for monetary damages for conduct as a director is eliminated, except for liability for any acts or omissions that involve intentional misconduct [or] . . . any transaction from which the director will personally receive a benefit in money, property, or services to which the director is not legally entitled . . ."
</blockquote>

(Dkt. No. 77-2 at 114.) The actions taken by the Governance Committee Defendants which Plaintiff scrutinizes do not represent intentional misconduct or that for which any of those Defendants "personally receive[d] a benefit." The Court is not persuaded by Plaintiff's argument that her additional request for equitable relief renders the Corporate Charter inapplicable.[10] The provisions in the Nordstrom Corporate Charter render the Governance Committee Defendants highly unlikely to face a substantial likelihood of liability.

The Court concludes that the Governance Committee Defendants were not "interested" under the *Aronson* test. *In re Affliated Computer Servs., Inc. Shareholders Litig.*, 2009 WL 296078, at *8 (Del. Ch. Feb. 6, 2009) (citing *Aronson*, 473 A.2d at 815).

### 3. Remaining Directors as of March 12, 2015

The remaining six members of the Board of Directors as of the time of the filing of this suit[11] are also disinterested and independent under the *Aronson* test. Plaintiff has not pled particularized facts to indicate that any of these Directors possessed a material financial or familial interest in the related-party transactions, that they were incapable of acting independently, or that they face a substantial likelihood of personal liability. Rather, Plaintiff only argues that the Board of Directors as a whole faces a substantial likelihood of liability based on the issuance of proxy statements indicating that "payments [from the Nordstrom family] exceeded the estimated cost to the Company of providing [aviation-related] services," (Dkt.No. 11 at 22–23) and a later proxy statement that stated, "in the board's opinion, the charges [to the Nordstrom family] were fair and beneficial to the Company because the payments allowed the

---

[10] Nor is the Court persuaded by Plaintiff's reading of the unpublished Delaware Chancery Court cited by the parties, *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *22 (Del. Ch. May 5, 2010).
[11] (1) Campbell, (2) Ebanks, (3) Miller, (4) Smith, (5) Turner, and (6) Archambeau (not a Defendant).

ORDER GRANTING RULE 23.1 MOTION TO DISMISS
PAGE - 17

Company to subsidize the cost of operating the Company's flight department." (Dkt. No. 11 at 24.)

While it is possible to consider these proxy statements to be misleading in hindsight, the Complaint does not plead sufficient, particularized facts to render Defendants Campbell, Ebanks, Miller, Smith, or Turner liable for their existence. Nor does the Complaint establish that, at the time they were issued, these statements did not represent the exercise of sound business judgment. *See Grobow v. Perot*, 526 A.2d 914, 928 (Del. Ch. 1987) *aff'd*, 539 A.2d 180 (Del. 1988) ("However controversial, unpopular, or even wrong . . . a decision might turn out to be, it is precisely the kind of business judgment that the rule is intended to enable an independent, disinterested board of directors to make."). This conclusion is buttressed by the added protections afforded these Defendants by virtue of the Nordstrom Corporate Charter.

In summary, of the thirteen members of the Nordstrom Board of Directors as of March 12, 2015, ten were disinterested and independent. Accordingly, the first prong of the *Aronson* test has not been satisfied.

## C.     The Business Judgment Rule has Not Been Rebutted

Furthermore, the Court finds that Plaintiff's pleadings fail to generate a reasonable doubt as to whether the related-party transactions represent the exercise of sound business judgment. The second *Aronson* prong asks whether the transaction in question is entitled to the protections of the "business judgment rule." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003). The business judgment rule creates a legal presumption that a company's directors acted on an informed basis, in good faith, and in the honest belief that they acted in the best interests of the corporation. *Aronson v. Lewis*, 473 A.2d 80, 812 (Del. 1984).

In order to rebut the presumption that a board's actions are entitled to deference, a plaintiff must plead particularized facts sufficient to raise a reason to doubt that either (1) the action was taken honestly and in good faith, or (2) that the board was adequately informed in making the decision. *In re Disney*, 825 A.2d at 286.

ORDER GRANTING RULE 23.1 MOTION TO DISMISS
PAGE - 18

The Complaint has not rebutted the presumption that members of Nordstrom's Board of Directors acted honestly and in good faith, or that they were adequately informed in making their decisions with respect to the related-party transactions. In so determining, the Court places particular emphasis on the ARGUS report upon which the Directors relied.

With respect to Plaintiff's corporate waste claim, there exists an especially high bar in pleading sufficient facts to create a reasonable doubt regarding whether a transaction was a valid exercise of business judgment. *Schwartzman v. McGavick*, 2007 WL 1174697, at *5 (W.D. Wash. Apr. 19, 2007). As one Delaware court noted, "[t]o allege a claim of waste sufficient to satisfy the criteria of *Aronson* and Rule 23. 1, the particularized pleaded facts must show that the consideration received by [the corporation] in the transaction 'was so inadequate that no person of ordinary, sound business judgment would deem it worth that which the corporation paid.'" *Grobow v. Perot*, 526 A.2d 914, 928 (Del. Ch.1987). Plaintiff has not satisfied this high bar, especially considering the independent assistance the Directors sought and received from ARGUS in setting their prices for aviation-related services.

In summary, Plaintiff's pleadings do not generate a reasonable doubt with respect to whether the Board of Directors exercised sound business judgment, and the second prong of *Aronson* has not been satisfied.

### III.   CONCLUSION

For the foregoing reasons, Nominal Defendant's Rule 23.1 Motion to Dismiss (Dkt. No. 76) is GRANTED. As Plaintiff lacks shareholder derivative standing to bring the above-captioned matter, her case is hereby DISMISSED with prejudice. *See Lucas v. Lewis*, 428 F. App'x 694, 696 (9th Cir. 2011) ("Because [Plaintiff] had not satisfied the demand requirements prior to filing suit, the district court's decision to dismiss with prejudice was appropriate."). Although the dismissal is with prejudice, Plaintiff is not precluded from later returning to the

Court to allege wrongful refusal of her demand on the basis of events that had not yet occurred at the time of this Order. *Id.*

DATED this 24 day of September 2015.

*[signature]*

John C. Coughenour
UNITED STATES DISTRICT JUDGE